FILED
CLERK

10/27/2016 4:37 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
EDWARD HONIG,

                                    Plaintiff,

                        -against-

CARDIS ENTERPRISES INTERNATIONAL N.V.,
CARDIS ENTERPRISES (U.S.A.)
INTERNATIONAL INC., AARON DAVID
FISCHMAN, GREG ELIAS, and AVI TOKAYER,

                                    Defendants.
---------------------------------------------------------------X
FEUERSTEIN, District Judge:

**OPINION AND ORDER**

14-cv-7548 (SJF)(GRB)

   On January 5, 2016, plaintiff Edward Honig ("Plaintiff") filed an Amended Complaint

(Dkt. 25) ("Amended Complaint" or "AC") against defendants Cardis Enterprises International

N.V. ("Cardis N.V."), Cardis Enterprises (U.S.A.) International Inc. ("Cardis U.S.A."), Aaron

David Fischman ("Fischman"), Greg Elias ("Elias"), and Avi Tokayer ("Tokayer") (Cardis N.V.,

Cardis U.S.A., Fischman, Elias, and Tokayer collectively, "Defendants").   In his Amended

Complaint, Plaintiff alleges that, in connection with his March 2014 acquisition of Cardis N.V.

stock, Defendants: (i) violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") and Rule 10b-5 promulgated thereunder (First Claim); (ii) violated Section 20(a) of the

Exchange Act (Second Claim); and (iii) committed common law fraud (Third and Fourth

Claims).   Plaintiff seeks compensatory and punitive damages.   (AC ¶ 85).   On March 7, 2016,

Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil

Procedure 9(b), 12(b)(4), 12(b)(5), and 12(b)(6).   (*See* Defendants' Memorandum in Support of

their Motion to Dismiss the Amended Complaint ("Def. Br.") (Dkt. 32-2)).   For the following

reasons, Defendants' motion to dismiss is granted in part and denied in part.

1

## I.   BACKGROUND [1]

### A.   The Parties

Plaintiff is a resident of New York who owns a "substantial number of shares of" Cardis N.V. stock.   (AC ¶ 18).   Cardis N.V. is a limited liability company organized under the laws of Curacao with its principal place of business in Curacao.   (Declaration of Greg Elias, dated October 2, 2016 ("Elias Decl.") (Dkt. 32-1) at ¶¶ 9-10).[2]   Cardis U.S.A. is a Delaware corporation with its principal place of business in Cedarhurst, New York.   (AC ¶¶ 3, 37, 44; Declaration of Daniel Scott Furst, Esq., dated February 15, 2016 ("Furst Decl.") (Dkt. 32-1), Ex. 4).   According to Plaintiff, Cardis N.V. "operates in the United States as [Cardis U.S.A.]" and the two companies "are one and the same."   (AC ¶ 3).   Referring to Cardis N.V. and Cardis U.S.A. collectively as "Cardis," Plaintiff alleges that "Cardis held itself out to be a creator and franchisor of software products that utilized so called 'new cost-effective technology' which was supposed to be valuable to the law-value consumer credit charge industry."   (AC ¶ 4).

Elias is a citizen and resident of Curacao, and he is the managing director of Cardis N.V. (AC ¶ 21; Elias Decl. at ¶¶ 2, 4).   Tokayer is a citizen and resident of Israel, and he is a director of Cardis U.S.A.   (AC ¶ 22; Declaration of Avi Tokayer, dated February 9, 2016 ("Tokayer

---

[1]  The facts set forth herein are derived from Plaintiff's Amended Complaint, the allegations of which are accepted as true for present purposes, other relevant documents that are incorporated by reference or are otherwise integral to the allegations in the Amended Complaint, and facts of which the Court takes judicial notice.   *See, e.g., DiFolco v. MSNBC Cable LLC*, 662 F.3d 104, 111 (2d Cir. 2010).

[2]  In the Amended Complaint, Plaintiff alleges that Cardis N.V. is "a foreign corporation with headquarters in Amsterdam, Netherland[s]."   (AC ¶ 3).   Elias, Cardis N.V.'s managing director, affirmed that Cardis N.V. is organized under the laws of and located in Curacao, and Plaintiff now recognizes that Cardis N.V. is a Curacao entity.   (*See, e.g.*, Plaintiff's Response to Defendants' Motion to Dismiss ("Pl. Opp. Br.") (Dkt. 32-6) at 9 ("A second and independently viable method of service against Cardis N.V. was accomplished when Plaintiff served Cardis N.V. via certified mail at its Curacao address listed in the Curacao Corporate Register.")).

Decl.") (Dkt. 32-1) at ¶ 3.   "Fischman was a high-level executive (CEO) and director at [Cardis U.S.A.] and [Cardis N.V.]…" at all relevant times.   (AC ¶ 55; Furst Decl., Ex. 4).

### B.    Relevant Procedural History

On December 30, 2014, Plaintiff filed his first complaint against corporate defendants Cardis Enterprises International N.V. ("Cardis N.V."), Cardis Enterprises (U.S.A.) International Inc. ("Cardis U.S.A."), Romlight International (U.S.A.) Inc. ("Romlight"), and Choshen Israel LLC ("Choshen"), and individual defendants Fischman, Tokayer, Steven Hoffman ("Hoffman"), and Lawrence Katz ("Katz"), raising federal securities fraud and common law fraud claims in connection with Plaintiff's purchase of Cardis N.V. stock, and seeking an accounting.   (Dkt. 1).   On March 30, 2015, those defendants moved to dismiss Plaintiff's complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(5), 12(b)(6).   (Dkt. 17-7).   Plaintiff opposed the motion and also sought leave to file an amended complaint.   (Dkt. 17-10).   On November 12, 2015, the Court, *inter alia*, granted the defendants' motion to dismiss Plaintiff's securities fraud and common law fraud claims as to all defendants apart from Cardis N.V. and Cardis U.S.A., granted the defendants' motion to dismiss Plaintiff's claim for an accounting, and granted Plaintiff leave to file an amended complaint.   (Dkt. 20).

During a status conference held on November 19, 2015, the Court, *inter alia*, directed defense counsel to disclose the identity of Cardis N.V.'s board members by 5:00 p.m. the next day.   (Dkt. 21).   In accordance with that directive, defense counsel left Plaintiff's counsel a voicemail identifying Elias as Cardis N.V.'s managing director.   (Dkt. 35 at 1).   On January 5, 2016, Plaintiff filed the Amended Complaint, removing Romlight, Choshen, Hoffman, and Katz as defendants, and adding Elias.   (Dkt. 25).

On March 7, 2016, the Defendants moved to dismiss Plaintiff's amended complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(4), 12(b)(5), 12(b)(6), arguing, *inter alia*, that Plaintiff failed to properly serve a summons and complaint upon Cardis N.V. (in Curacao), Elias (in Curacao), and Tokayer (in Israel).   (Dkt. 32-2 at 7-12).   In his opposition brief, Plaintiff argued, *inter alia*, that he was "currently in the process of attempting to locate … Elias in Curacao" so that he could effectuate service.   (Dkt. 32-6 at 10).

During a status conference held on May 16, 2016, Plaintiff's counsel represented that he had not served Elias with a copy of the summons and Amended Complaint, and asked that the Court compel Defendants to disclose Elias' personal contact information in Curacao to aid Plaintiff's service efforts.   (Dkt. 34).   On May 24, 2016, Plaintiff filed a letter in support of this request (Dkt. 35), and on May 31, 2016 the Defendants filed a letter opposing Plaintiff's request (Dkt. 36).   On June 6, 2016, the Court denied Plaintiff's request on the ground that, Plaintiff had "offer[ed] no evidence that he ha[d] made any effort to serve Elias in Curacao or obtain whatever information he may need to effectuate service" before first seeking the Court's intervention. (Dkt. 37).   Plaintiff has yet to file any proof of service upon Elias.

### C.    The Allegedly Fraudulent Sale of Cardis N.V. Stock

Plaintiff alleges that he "purchased in excess of 1.5 million shares of [Cardis N.V.] stock in 2014 and 2012, based on false statements made by the individual defendants [Fischman, Elias, and Tokayer] and by agents of the corporate defendants [Cardis N.V. and Cardis U.S.A.] with the knowledge and under the oversight of the individual defendants as CEO, managing director, and directors of the corporate defendants."   (AC ¶ 3).

At some unspecified time prior to March 2014, Plaintiff had invested in Romlight, "another corporate entity controlled by Defendant Fischman."   (AC ¶ 37).   On March 5, 2014,

apparently dissatisfied with his Romlight investment, Plaintiff met with Fischman "at Cardis's offices … [in] Cedarhurst, New York" and "demanded an accounting with regard to his investment in Romlight and an explanation about the status of Romlight's operations."   (AC ¶ 37).   In response, Fischman told Plaintiff "that he could not provide [him] with any of the requested information about Romlight but that he could compensate [him] for his Romlight shares by paying him with shares in Cardis."   (AC ¶ 38).

Plaintiff claims that, at some point in 2013, he had received "a PowerPoint presentation [that was] distributed to perspective [sic] investors" in which Defendants represented that "Cardis ha[d] a patented technology covering the only known way to overcome the two main issues faced by (competitor) e-purse systems," that "Cardis possessed 'patented aggregation technology' that amounted to 'a game changing technology solution for the processing of low value (credit card) payments,' [and that] Cardis' patented technology was already deployed and operational with Visa Europe."   (AC ¶ 7).   According to Plaintiff, this was untrue because "Cardis did not have a working software product, or other marketable product."   (AC ¶ 8).

Between March 5, 2014 and March 24, 2014, Plaintiff claims to have "reviewed a press release issued by Cardis on October 9, 2013, which claimed that it had a functional product that 'enables several consumer transactions made at different retailers to be handled with only one transaction processed through the payment network, thereby significantly lowering the overall transaction costs.' "   (AC ¶ 39).   This press release also indicated that "this supposed functional product was being used, by an existing agreement, by a company called Spindle, to assist it with processing credit card transactions in vending machines."   (AC ¶ 39).   Plaintiff alleges that, in fact, there was no functional product and that "any so called 'deal' with Spindle was not an arm's length contractual transaction."   (AC ¶ 40).   Specifically, Plaintiff alleges that "Fischman

5

promised Spindle that he or Cardis would pay [Spindle] $500,000 … in order to perpetuate [Defendants] fraud."  (AC ¶ 40).  Plaintiff also alleges that Fischman told him that "Cardis was in the midst of signing a contract with MasterCard," which, "upon information and belief, was false."  (AC ¶ 42).

Plaintiff further alleges that "[d]uring this same time period [*i.e.,* March 5 – 24, 2014], Defendant Fischman and other agents of [Cardis N.V. and/or Cardis U.S.A.] orally represented to [Plaintiff] and, upon information and belief, to many other Cardis investors, that Cardis was engaged in extensive negotiations with investment banks and was imminently going to go public," and that such statements were false.  (AC ¶¶ 41, 58).

Finally, Plaintiff alleges that Defendants misrepresented their intended use of investment proceeds.  According to Plaintiff, at some unspecified point(s) between 2007 and 2014, "Defendants, through their agents and private placement memoranda, stated that the vast majority of the proceeds raised in private placement offerings had been and would be used for branding, marketing and product development."  (AC ¶¶ 29, 32; *see also* AC ¶ 9-10).  Plaintiff claims that such representations were false and that "the [Defendants] knew that all of those proceeds went directly to Cardis directors and officers as executive salaries and directors' fees to the Defendants."  (AC ¶ 33).  According to Plaintiff, "none of the money that [he] and other investors invested went towards developing Cardis into a company designed to operate for any other purpose than enriching individual defendants at the expense of shareholders."  (AC ¶ 35).

"On March 25, 2014, Cardis, through Defendant Fischman and sales agent Steven Hoffman, sold [Plaintiff] … 1,844,556 shares of [Cardis N.V.] in exchange for [Plaintiff's] shares of Romlight."  (AC ¶ 43).  Plaintiff alleges that he "purchased Cardis stock in ignorance of the fact[s] that: the Cardis' [sic] statements about its patent, product and product readiness

6

were untrue; Cardis's sales and contracting claims were untrue; that statements that the Cardis [sic] was about to go public were untrue; [and] that Cardis' representations of its use of offering proceeds were untrue."   (AC ¶ 58).

"On November 27, 2014, … at Cardis's offices … [in] Cedarhurst, New York …, [Plaintiff] asked [Fischman] to see Cardis books, records, and evidence that it even owned any patents," and Fischman refused.   (AC ¶ 44).   During that meeting, Plaintiff accused Fischman of fraud, specifically "taking people's money … knowing that Cardis had no real operations, plan, or prospect for success" in order to enrich himself, to which Fischman did not respond. (AC ¶ 45).   Plaintiff does not specify how much the Romlight shares that he exchanged for the Cardis N.V. shares were worth in March 2014 or how much they are worth now, but he alleges that his Cardis N.V. shares are now worth nothing and that the transaction has caused him actual damages in excess of $750,000.   (*See* AC ¶¶ 11, Prayer for Relief).

## II.   DISCUSSION

### A.   Service of Process

Defendants argue that Plaintiff failed to properly serve (or serve at all) Cardis N.V., Elias, and Tokayer with a summons and complaint and/or Amended Complaint, and therefore seek dismissal of these defendants under Federal Rules of Civil Procedure 12(b)(4) and/or (5).   (*See* Def. Br. at 7-12).   Defendants are correct as to Elias and Tokayer, but incorrect as to Cardis N.V.

#### 1.   Legal Standard

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."   *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (quoting *Omni Capital Int'l, Ltd. v. Rudolph Wolff*

*& Co.*, 484 U.S. 97, 104 (1987)).   "Once a defendant raises a challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy."   *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

Federal Rule of Civil Procedure 4 governs the manner in which domestic and foreign defendants may be served.   *See generally* Fed. R. Civ. P. 4.   Rule 4(f), which governs service upon individuals in foreign countries, provides:

> "Unless federal law provides otherwise, an individual – other than a minor, an incompetent person, or a person whose waiver has been filed – may be served at a place not within any judicial district of the United States:
>
> > **(1)** by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents[3];
> >
> > **(2)** if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
> >
> > > **(A)** as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
> > >
> > > **(B)** as the foreign authority directs in response to a letter rogatory or letter of request; or
> > >
> > > **(C)** unless prohibited by the foreign country's law, by:
> > >
> > > > **(i)** delivering a copy of the summons and of the complaint to the individual personally; or
> > > >
> > > > **(ii)** using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
> >
> > **(3)** by other means not prohibited by international agreement, as the court orders."

---

3  Hereinafter, referred to simply as the "Hague Convention."

Fed. R. Civ. P. 4(f).   Rule 4(h), which governs service upon corporations, partnerships, or other associations, provides in pertinent part that "[u]nless federal law provides otherwise … a domestic or foreign corporation … must be served:

> **(1)** in a judicial district of the United States:
>
> \*\*\*
>> **(B)** by delivering a copy of the summons and of the complaint to an officer…; or
>
> **(2)** at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."

Fed R. Civ. P. 4(h).

Accordingly, Rule 4(h) permits, *inter alia*, a foreign corporate defendant to be served outside of the United States in accordance with the Hague Convention, provided its country of domicile is a signatory, or within the United States by service upon an officer.   "The Hague Convention provides for several alternate methods of service: (1) service through the Central Authority of member states; (2) service through consular channels; (3) service by mail if the receiving state does not object; and (4) service pursuant to the internal laws of the state."   *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) (citing Hague Convention, Arts. 5, 6, 8, 9, & 10).

## 2.     Cardis N.V.

Defendants recognize that "Cardis NV has agreed to service under internationally agreed means" because it is formed under the laws of and located in Curacao, which, according to Defendants, "is a party to the Hague Convention."   (Def. Br. at 8; Elias Decl. at ¶ 31).   While

9

Curacao itself does not appear on the list of signatories to the Hague Convention,[4] and

Defendants have not offered this explanation, the Court takes judicial notice of the fact that, if

Curacao is bound by the Hague Convention, it is due to its association with the Netherlands,[5]

which is a signatory.[6]

"The Netherlands has not objected to sending judicial documents by 'postal channels' [in

accordance with Article 10(a) of the Hague Convention]…, and consequently service of process

through a 'postal channel' on a corporation in the Netherlands is permissible, even if it does not

comply with the requirements of Federal [Rule of Civil Procedure] 4." *In re Hawker*

*Beechcraft, Inc.*, 486 B.R. 264, 283 (Bankr. S.D.N.Y. 2013) (citing *Tinsley v. ING Grp.*, No.

Civ.A. 05-808-KAJ, 2006 WL 533375, at *1 (D.Del. Mar. 3, 2006), and *Ackermann v. Levine*,

788 F.2d 830, 840-41 (2d Cir. 1986)).   Given the facts that Curacao's connection to the Hague

Convention is through the Netherlands and that Defendants have offered no authority to the

contrary, the Court finds that service upon a company in Curacao through a "postal channel"

pursuant to Article 10(a) of the Hague Convention is permissible, as with service through a

"postal channel" upon a company in the Netherlands, regardless of whether or not such service

complies with the requirements of Federal Rule of Civil Procedure 4.[7]   On February 25, 2016,

Plaintiff filed an affidavit of Jennifer Hennessey, a paralegal in Plaintiff's counsel's office,

---

4  *See* https://www.hcch.net/en/states/hcch-members

5  *See* https://www.government.nl/topics/caribbean-parts-of-the-kingdom/contents/representation-of-the-netherlands-in-aruba-curacao-and-st-maarten

6  *See* https://www.hcch.net/en/states/hcch-members/details1/?sid=3

7  Thus, Defendants' argument that Plaintiff's Opposition "fails to direct the Court to actual proof of process and service on Cardis NV within the 120-day time limit imposed by Rule 4(m) [and] makes no showing as to why service could not be timely made…" is not persuasive.   It is also not persuasive because Rule 4(m) specifically provides that "[t]his subdivision (m) does not apply to service in a foreign country under Rule 4(f), 4(h)(2), or 4(j)(1)."   Fed. R. Civ. P. 4(m).

affirming that, on June 9, 2015, Ms. Hennessey had served a summons and complaint upon Cardis N.V. "by USPS International Registered Mail and USPS International Mail" at Cardis N.V.'s Curacao address, as listed in the Curacao Commercial Register.   (Dkt. 29).

Accordingly, the Court deems Cardis N.V. to have been effectively, appropriately, and timely served with process in Curacao.

Moreover, the Court deems Cardis N.V. to have been served in accordance with Federal Rule of Civil Procedure 4(h)(1)(B) – which allows for service upon a "foreign corporation … or other unincorporated association" by serving an "officer" within the United States – when Plaintiff served Fischman in New York.   (Dkt. 6).   Plaintiff alleged that Fischman functioned as Cardis N.V.'s CEO and that Cardis N.V. and Cardis U.S.A. are effectively "one and the same." (AC ¶¶ 3, 19, 55).   Defendant argued that Cardis N.V. is entirely separate from Cardis U.S.A. and has no connection to New York.   (*See, e.g.,* Def. Br. at 8-11).   However, on May 4, 2016, Fischman filed an affidavit of confession of judgment in connection with a case pending in the New York State Supreme Court, Nassau County,[8] representing, *inter alia*, that he is the CEO and Director of Cardis N.V. and the President and CEO of Cardis U.S.A., and that both Cardis U.S.A. and Cardis N.V. "have offices at 445 Central Avenue, Cedarhurst, New York 11516…" (Dkt. 39-1 at 1, ¶ 1).   In response, Defendants filed an undated declaration from Fischman, which was prepared in connection with a separate lawsuit against Cardis N.V., Cardis U.S.A., Fischman, and Tokayer, among others, pending before this Court,[9] representing, *inter alia*, that the state court affidavit was incorrect and that he in fact is "not now, and was never an officer …

---

8 *Maidenbaum v. Cardis Enterprises International, B.V., et al.* (NYSS, Nassau County, Index No. 604766/2016).

9 *Weinstein v. Cardis Enterprises International N.V., et al.* (E.D.N.Y. Case No. 16-cv-2661 (SJF)(SIL)).

of Cardis N.V.," that "Cardis N.V. also does not have offices at 445 Central Avenue Cedarhurst, New York 11516," and that he is "taking affirmative actions to correct the record" in the state court action.   (Dkt. 40-1, ¶¶ 6-7).

Fischman's explanation that he unwittingly signed an affidavit of confession of judgment on behalf of Cardis N.V., which stated (both in the first paragraph and in the signature block) that he was the CEO and Director of Cardis N.V., strains credulity.[10]   At this stage of the litigation, the Court credits the Amended Complaint's allegation (at ¶ 55) that Fischman functioned as Cardis N.V.'s CEO at all relevant times, particularly in light of the fact that Fischman himself affirmed as much in connection with a separate state court proceeding.   Thus, Cardis N.V. was effectively served both in Curacao under the Hague Convention and in New York, via Fischman, under Rule 4(h)(1)(B).   Accordingly, Defendants' motion to dismiss under Rules 12(b)(4) and (5) is denied as to Cardis N.V.

### 3.   Elias

As discussed above, on November 19, 2015, the Court directed Defendants to disclose to Plaintiff the identity of Cardis N.V.'s and Cardis U.S.A.'s board members, and, on November 20, 2015, Defendants' counsel informed Plaintiff's counsel that Elias is the managing director of Cardis N.V.   (Dkt. 21, 35).   On January 5, 2016, Plaintiff filed the Amended Complaint, naming Elias as a defendant.   (Dkt. 25).   During a status conference on May 16, 2016, Plaintiff's counsel informed the Court that he had not yet served Elias with a summons and complaint and asked that the Court compel Defendants to provide Elias's contact information in

---

10  The Court also takes notice of the fact that the plaintiff in *Weinstein v. Cardis Enterprises International N.V., et al.* (16-cv-2661 (SJF)(SIL)) has offered evidence that Fischman has signed a shareholder statement on behalf of Cardis N.V. and was listed as Cardis N.V.'s director in the signature block of a Cardis N.V. loan agreement (Dkt. 44-1, 52-2).

Curacao.   (Dkt. 34).   The Court directed Plaintiff to file a letter motion seeking this relief, which Plaintiff filed on May 24, 2016 and Defendants opposed the following week.   (Dkt. 34, 35, 36).   On June 6, 2016, the Court denied Plaintiff's motion to compel the disclosure of Elias's contact information on the ground that, *inter alia*, "Plaintiff offer[ed] no evidence that he ha[d] made any effort to serve Elias in Curacao or to obtain whatever information he may need to effectuate service" prior to seeking the Court's intervention.   (Dkt. 37).   It has now been nearly ten (10) months since Plaintiff filed the Amended Complaint, and Plaintiff has not served Elias or demonstrated any effort to serve Elias.   Accordingly, Defendants' motion to dismiss pursuant to Rules 12(b)(5) is granted as to Elias.   In any event, Plaintiff has not stated a viable claim against Elias.  *See infra.*

### 4.   Tokayer

On March 10, 2015, Plaintiff filed an affidavit of Jonathan S. Easton, an Israeli process server, indicating that Mr. Easton had personally served Tokayer with a summons in Ra'anana, Israel on March 9, 2015.   (Dkt. 12).   Israel is a signatory to the Hague Convention,[11] but has not consented to personal service directly upon its citizens under Article 10(c) of the Hague Convention; it demands the involvement of its "central authority," which, in Israel, is "The Director of Courts, Directorate of Courts, Russian Compound, Jerusalem."   *Friedman v. Israel Labour Party*, 96-cv-4702, 1997 WL 379181, at *3 (E.D. Pa. July 2, 1997) (quoting Hague Convention, Declaration of the State of Israel).   "Israel's ratification declaration … expressly limits the freedom of plaintiff to serve 'judicial documents directly through competent persons of the State of destination' [under Article 10(c)] and instead requires that alternative personal

---

11 *See* https://www.hcch.net/en/states/hcch-members/details1/?sid=45

service be effected 1) through the Directorate of Courts and 2) after a judicial or diplomatic request from the state of origin."   *Id.*   It is evident that Plaintiff simply hired an Israeli process server to personally serve Tokayer in Israel without going through the proper U.S. and Israeli channels.   (*See* Dkt. 12).   Despite naming Tokayer a defendant when he filed his original complaint in December 2014, Plaintiff has yet to properly serve Tokayer with a summons and complaint.   Accordingly, Defendants' motion to dismiss pursuant to Rule 12(b)(5) is granted as to Tokayer.   In any event, Plaintiff has not stated a viable claim against Tokayer.   *See infra.*

### B.      Sufficiency of Claims

#### 1.      Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), district courts "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor."   *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotations omitted).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"   *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   "[A] complaint is not required to have 'detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'"   *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

#### 2.      Exchange Act Claims

Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act against all Defendants.   (AC ¶¶ 50-68).   Section 10(b) renders it unlawful to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may

14

prescribe as necessary or appropriate in the public interest or for the protection of investors."  15

U.S.C. § 78j(b); *see Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).  SEC Rule 10b-

5, which is promulgated under § 10(b), provides that:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce, or of
> the mails or any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) liability is commonly referred to as "primary liability."

*See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191

(1994); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 467 (2d Cir. 2013).

    Section 20(a) of the Exchange Act allows for secondary, or "controlling person,"

liability.  It provides, in pertinent part, that "[e]very person who, directly or indirectly controls

any person liable under any provision of this chapter or of any rule or regulation thereunder shall

also be liable jointly and severally with and to the same extent as such controlled person…unless

the controlling person acted in good faith and did not directly or indirectly induce the act or acts

constituting the violation or cause of action."  15 U.S.C. § 78t(a); *see Steginsky v. Xcelera Inc.*,

741 F.3d 365, 371 (2d Cir. 2014).  A plaintiff asserting a Section 10(b) "primary liability" claim

may assert a Section 20(a) "controlling person liability" claim against the same defendant as an

alternative theory of liability, but the defendant cannot be held liable under both theories.  *See In*

*re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("'Controlling-person liability' is

a separate inquiry from that of primary liability and provides an alternative basis of culpability.")

(internal citations omitted); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 440 (E.D.N.Y. 2014)

("'Controlling-person liability' may be pled as an alternative to primar[y] liability as a basis for

establishing liability.") (internal citations omitted); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339,

368-69 (S.D.N.Y. 2013) ("While a party cannot be held liable for both a primary violation and as

a control person, alternative theories of liability are permissible at the pleading stage.") (quoting

*In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010)).

### a.  Section 10(b) / Rule 10b-5

To state a viable claim under Section 10(b) and Rule 10b-5, a complaint must allege "(1)

a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Carpenters Pension*

*Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge*

*Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 553 U.S. 148, 157 (2008)).

In addition to these basic elements, a complaint asserting a Section 10(b) claim is also

subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), 109 Stat. 737.  *See, e.g., Rombach v. Chang*, 355 F.3d 164,

172 (2d Cir. 2004) ("To meet the pleading standard of Rule 9(b), this Court has repeatedly

required, among other things, that the pleading 'explain why the statements were fraudulent.'…

The PSLRA imposes similar requirements to claims brought under the Exchange Act.").   Rule

9(b) provides that, when "alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b).   Stating the circumstances

16

of fraud with sufficient particularity means: "(1) specify[ing] the statements that plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent."  *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach*, 355 F.3d at 170).

"The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement was misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' "  *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (additional quotations marks and internal alterations omitted).   The required state of mind in a Section 10(b) case – scienter – is an intent "to deceive, manipulate, or defraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (hereinafter, "ECA") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (additional citations omitted).   In this Circuit, allegations of recklessness – defined as "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" – may suffice to establish "a sufficiently culpable mental state for securities fraud."  *Id.* (internal citations, quotations, and alterations omitted).

Defendants argue that Plaintiff has failed to adequately allege material misrepresentations or omissions attributable to them, scienter, and loss causation.   (*See* Def. Br. at 15-18).

i.   <u>Material misrepresentations or omissions</u>

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with

ultimate authority over the statement, including its content and whether and how to communicate

it.   Without control, a person or entity can merely suggest what to say, not 'make' a statement in

his own right.   One who prepares and publishes a statement on behalf of another is not its

maker."   *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Even where a complaint does not specifically allege that a particular defendant is the direct

"maker" of a material misstatement, the complaint may nonetheless survive dismissal under the

"group pleading doctrine," which "allows plaintiffs to 'rely on a presumption that statements in

prospectuses, registration statements, annual reports, press releases, or other group-published

information are the collective work of individuals with *direct involvement in the everyday*

*business of the company.*' "   *Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 647

n. 13 (S.D.N.Y. 2012) (quoting *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.

1999)) (emphasis added).   A Section 10(b) / Rule 10b-5 plaintiff may not rely upon the group-

pleading doctrine unless he shows that there is a " 'tight weave of connections between' all [of]

the Defendants."   *Id.* (quoting *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 405

(S.D.N.Y. 2010)).

Even assuming *arguendo* that Plaintiff had properly served Elias and Tokayer, the

Amended Complaint fails to identify any material misstatements or omissions attributable to

them as "makers" themselves, and fails to allege facts sufficient to invoke the group-pleading

doctrine against them.   Plaintiff alleges that Elias is a director of Cardis N.V. and that Tokayer

is a director of Cardis U.S.A.   (AC ¶¶ 21, 22).   Plaintiff does not allege that he ever

communicated with Elias or Tokayer or that either of these defendants were the source of any

misleading information that Plaintiff or other investors received.   Plaintiff simply asserts that

"because of [Elias's and Tokayer's] positions … as … directors …, [they] possessed the power

and authority to control the contents of private placement offerings …, including their private

memoranda, internal accounting procedures, and representations made by Cardis selling agents

when securities were sold to [Plaintiff]." (AC ¶ 23; *see also* AC ¶ 55).   Plaintiff does not

directly attribute any misrepresentations or omissions to Elias or Tokayer, and offers no facts

that would allow the Court to infer that either Elias or Tokayer, as directors located in Curacao

and Israel, had "direct involvement in the everyday business of the company."   *See, e.g., Levy*,

48 F. Supp. 3d at 451-52 (dismissing claims against director-defendants where "Plaintiff only

allege[d] that [defendants] are members of the Board of Directors" and complaint "contain[ed]

very few allegations which do not support a finding that the board members … were 'corporate

insiders' with direct involvement in the daily affairs of [the company]").   Thus, even if Plaintiff

had properly served Elias and Tokayer, the Amended Complaint does not state a viable Section

10(b) / Rule 10b-5 claim against them, and Defendants' motion to dismiss Plaintiff's Section

10(b) claims is granted as to Elias and Tokayer.

However, the Amended Complaint does adequately allege material misstatements

attributable to Fischman, Cardis N.V., and Cardis U.S.A.   Plaintiff alleges that, prior to his

March 25, 2014 purchase of 1,844,556 shares of Cardis N.V. stock in exchange for his Romlight

shares, these defendants made misleading statements concerning Cardis N.V.'s operations,

technology, and business prospects.   First, Plaintiff alleges that, in 2013, Cardis N.V. and/or

Cardis U.S.A.[12] distributed a PowerPoint presentation to Plaintiff and other potential investors

---

12  At this stage of the litigation, the Court credits Plaintiff's allegation that Cardis N.V. "operates in the United
States as [Cardis U.S.A.]" and that the two companies "are one and the same" (AC ¶ 3), particularly in light of the

representing that "Cardis ha[d] a patented technology covering the only known way to overcome the two main issues faced by (competitor) e-purse systems," [that] Cardis possessed 'patented aggregation technology' that amounted to 'a game changing technology solution for the processing of low value (credit card) payments,' [and that] Cardis' patented technology was already deployed and operational with Visa Europe."   (AC ¶ 7).   Plaintiff claims that this was untrue because "Cardis did not have a working software product, or other marketable product." (AC ¶ 8).[13]

Second, Plaintiff alleges that on October 9, 2013, Cardis N.V. and/or Cardis U.S.A. issued a press release claiming that it had a functional product that "enables several consumer transactions made at different retailers to be handled with only one transaction processed through the payment network, thereby significantly lowering the overall transaction costs" and referencing an existing partnership with a company called Spindle when, in fact, there was no functional product and there was no arms-length business relationship with Spindle.   (AC ¶¶ 39-40).   Defendants respond to this by attaching to Fischman's declaration an October 9, 2013 press release that was ostensibly generated by Spindle, and arguing that "[a]s a threshold obstacle, the individual defendants did *not* prepare or disseminate the Spindle Press Release,"

---

affidavit of Morris Berger, Cardis U.S.A.'s former chief operating officer, supporting this allegation (Dkt. 32-6), and Fischman's state court affidavit and confession of judgment (Dkt. 39-1), which says that Cardis N.V. and Cardis U.S.A. share a CEO (Fischman) and operate out of the same office in Cedarhurst, New York.

13  Defendants argue that a March 2014 list of patents and trademarks annexed to Elias's declaration (Elias Decl. Ex. B) "flatly contradict[s]" Plaintiff's allegation that the 2013 PowerPoint was materially misleading.   (Def. Br. at 4).   While this argument is more properly reserved for summary judgment, it also does not logically follow that owning a handful of patents and/or trademarks (many of which appear to have either expired or to have been on the verge of expiration as of March 2014) also means owning "patented technology covering the only known way to overcome the two main issues faced by (competitor) e-purse systems," possessing "a game changing technology solution for the processing of low value (credit card) payments," and/or having a business relationship with Visa Europe.

and so cannot be liable for any misstatements contained therein.   (Def. Br. at 14 (emphasis in

original); Fischman Decl. ¶¶ 15-17, Ex. A).   However, the October 9, 2013 Spindle press release

contains direct quotations from Fischman, including: "Our combined platform brings the ability

to right the economics of low-value transactions for everyday consumer purchases, and enable

millions of merchants to participate in this burgeoning economy."   (Dkt. 32-1 at 26).   Plaintiff

alleges that Spindle only agreed to publicly announce a partnership with Cardis U.S.A. and/or

Cardis N.V. because "Fischman promised Spindle that he or Cardis would pay it $500,000" and

that the "so called 'deal' with Spindle was not an arm's length contractual transaction" (AC ¶

40), and that Cardis U.S.A. and/or Cardis N.V. did not actually have a functional product (*see*

AC ¶¶ 8, 40), which would render Fischman's quoted statement in the press release false and

misleading.   Accepting Plaintiff's allegations as true, Fischman, Cardis N.V., and/or Cardis

U.S.A. could each be liable under Section 10(b) / Rule 10b-5 for any misstatements that

Fischman made,[14] regardless of whether those misstatements appeared in Spindle's press release

or Cardis N.V.'s / Cardis U.S.A.'s own press release.   *See SEC v. E-Smart Technologies, Inc.*,

74 F. Supp. 3d 306, 319-20 (D.D.C. 2014) (CEO liable for misstatements contained in press

release written by external public relations consultant where CEO "endorsed the statements" and

"approved of the statements in the release"); *Lindelow v. Hill*, No. 00-c-3727, 2001 WL 830956,

at *6 (N.D. Ill. July 20, 2001) (officers of both acquiring and acquired companies may be liable

under § 10(b) for misstatements contained in press release issued by acquiring company where

---

14  Fischman's fraudulent statements or actions may be attributable to Cardis N.V. and/or Cardis U.S.A.   *See, e.g.,*
*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369 (S.D.N.Y. 2012)
("[T]he intent of an executive who acted with scienter can be imputed to the company.") (citing *Teamsters Local*
*445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)); *In re ChinaCast Educ.*
*Corp. Sec. Litig.*, 809 F.3d 471, 472 (9th Cir. 2015) (CEO's "fraudulent misrepresentations – and, more specifically,
his scienter or intent to defraud – can be imputed to [his corporate employer]" even though CEO's fraudulent actions
were adverse to his employer's interests).

"press release directly quote[d]" individual defendants affiliated with both the acquiring and acquired companies).

Third, Plaintiff alleges that, between March 5, 2014 and March 24, 2014, Fischman falsely told Plaintiff that "Cardis was engaged in extensive negotiations with investment banks and was imminently going to go public," and that "Cardis was in the midst of signing a contract with MasterCard."   (AC ¶¶ 41-42).   Such alleged misstatements may also be imputed to Cardis U.S.A. and/or Cardis N.V.   *See City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 369 (S.D.N.Y. 2012); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 472.   Accordingly, Plaintiff has adequately alleged material misstatements attributable to Fischman, Cardis N.V., and Cardis U.S.A.

### ii.   Scienter

To establish scienter in a Section 10(b) / Rule 10b-5 action, a plaintiff must show that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.   The PSLRA requires securities fraud plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A); *Steginsky*, 741 F.3d at 368.   "A complaint will survive … only if the factual allegations, taken collectively, would allow a reasonable person to deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   *Slayton v. American Express Co.*, 604 F.3d 758, 774 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).

"Scienter may be established by facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."   *City of Pontiac Policemen's and Firemen's Ret. Sys. v.*

*UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014); *see ECA*, 553 F.3d at 198.   "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the corporate defendant] or its officers benefitted in some concrete and personal way from the purported fraud."   *ECA*, 553 F.3d at 198 (internal quotations omitted).   "Strong circumstantial evidence" can be established through allegations that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."   *Id.* at 199.

Plaintiff alleges that he had invested in Romlight, "another corporate entity controlled by Defendant Fischman," and that, when he confronted Fischman about this investment on March 5, 2014, Fischman offered to "compensate [Plaintiff] for his Romlight shares by paying him with shares of Cardis."   (AC ¶¶ 37-38).   Plaintiff alleges that, prior to purchasing 1,844,556 Cardis N.V. shares on March 25, 2014, he had reviewed a Cardis N.V. / Cardis U.S.A. PowerPoint presentation and press release that represented, *inter alia*, that Cardis N.V. possessed functional technology and business relationships that did not actually exist.   (AC ¶¶ 7-8, 39-40, 43). Plaintiff alleges that between March 5, 2014 and March 24, 2014, Fischman told Plaintiff that "Cardis was engaged in extensive negotiations with investment banks and was imminently going to go public," and that "Cardis was in the midst of signing a contract with MasterCard," all of which was false.   (AC ¶¶ 41, 42, 58).   Plaintiff alleges that, rather than using investment proceeds for "branding, marketing and product development," those "proceeds went directly to Cardis directors and officers as executive salaries and directors' fees."   (AC ¶¶ 32, 33).   The Amended Complaint also offers figures from Cardis N.V.'s 2011 and 2012 financial statements that seemingly support Plaintiff's contention: in 2011, $3,485,551 of $4,652,825 in total

23

expenses were comprised of "consultancy" and "finders'" fees, and in 2012, $4,227,359 of $5,667,906 in total expenses were comprised of "consultancy and development fees." In sum, Plaintiff has plausibly alleged that Fischman knowingly misrepresented material facts about Cardis N.V.'s technology and business prospects in order to secure investments from Plaintiff and others, the proceeds of which substantially went into Fischman's (and other directors') own pockets. Accordingly, Plaintiff has plausibly alleged that Fischman obtained a "concrete and personal" benefit as a result of the misrepresentations and therefore acted with the scienter required to sustain a claim under Section 10(b) / Rule 10b-5. As CEO, Fischman's scienter is attributable to Cardis N.V. / Cardis U.S.A. *See, e.g., City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 369 (S.D.N.Y. 2012); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 472.

### iii.   Loss causation

The PSLRA provides, in pertinent part, that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Loss causation is the requirement that a plaintiff allege that the 'defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.' " *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305 (S.D.N.Y. 2005) (quoting *Dura Pharms.*, 544 U.S. at 346). "To plead loss causation, the complaint[ ] must allege facts that support an inference that [the defendant's] misstatements and omissions concealed circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005). Where a plaintiff alleges that a defendant

24

"disguised the very risk to which [the plaintiff] fell victim," they have adequately pled loss

causation.  *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 189 (2d Cir. 2001).

Defendants argue that "the Amended Complaint fails to plead specific facts against each

Defendant to link their alleged misconduct to Plaintiff's alleged loss," and that "Plaintiff's actual

grievance lies in the fact that the intended business has not achieved the result Plaintiff had

desired."  (Def. Br. at 18; Def. Reply Br. at 16).  Defendants ignore Plaintiff's allegations that

Defendants represented that Cardis N.V. had marketable technology when there was none, had

valuable business relationships that did not exist, and was "imminently going to go public" when

in fact it was not.  (*See* AC ¶¶ 7-8, 39-43, 58).  Plaintiff alleges that each of these

representations was inaccurate, that his Cardis N.V. stock is worth nothing, and that he has

suffered at least $750,000 in compensatory damages as a result of the transaction.  (AC ¶¶ 11,

47-49, Prayer for Relief).  Plaintiff has adequately alleged that Fischman and Cardis N.V. /

Cardis U.S.A. "disguised the very risk[s] to which [he] fell victim" – *i.e.*, that Cardis N.V. had

no marketable technology or valuable business relationships, and that it was not going to go

public – and has therefore adequately alleged loss causation.  Accordingly, Plaintiff has stated a

viable Section 10(b) claim against Fischman, Cardis N.V., and Cardis U.S.A.

### b.    Section 20(a)

Defendants argue that Plaintiff's Section 20(a) "controlling person liability" claims

should be dismissed and Plaintiff did not respond to this argument in his opposition brief.  (Def.

Br. at 18-20; Pl. Opp. Br. *passim*).  Plaintiff's Section 20(a) claims are therefore deemed

abandoned.  *See, e.g., Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 275

(S.D.N.Y. 2008) (internal citations omitted).  In any event, Plaintiff's Amended Complaint

suggests that defendants Fischman, Cardis N.V., and Cardis U.S.A. are primary violators liable

under Section 10(a) rather than control persons liable under Section 20(a).   *See, e.g., Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) ("Under plaintiff's theory … the Directors would be primary violators rather than control persons … Therefore, under plaintiff's own theory, the Directors could not be control persons and section 20(a) does not apply."). Accordingly, Plaintiff's Section 20(a) claims are dismissed.

### 3.   Common Law Fraud Claims

In addition to his federal securities fraud claims, Plaintiff asserts claims of "common law fraud" (Third Claim) and "fraud in the inducement" (Fourth Claim) premised upon the same alleged underlying misrepresentations, stock purchase, and damages that the securities fraud claims are premised upon.   (*See* AC ¶¶ 69-84).   In order to state a viable fraud claim under New York law, a complaint must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."   *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).   The elements of a "fraudulent inducement" claim are functionally equivalent to the elements of a general fraud claim.   *See, e.g., Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (elements of fraudulent inducement under New York law are "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance") (internal quotations and citations omitted).   The contents of Plaintiff's "common law fraud" and "fraud in the inducement" claims are identical (compare AC ¶¶ 69-76 with AC ¶¶ 77-84), and Plaintiff's reasoning – if there was any – for styling these as two (2) separate claims rather than a single fraud claim is unclear.   Accordingly, the Court treats

26

Plaintiff's purportedly separate "common law fraud" and "fraud in the inducement" claims as a single claim for fraud, and dismisses Plaintiff's Fourth Claim (AC ¶¶ 77-84) as duplicative of his Third Claim (AC ¶¶ 69-76).

The elements of and pleading requirements applicable to common law fraud claims mirror the elements of and pleading requirements applicable to Section 10(b) claims, so an "identical analysis applies" to both sets of claims. *Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) (internal quotations and citations omitted); *see also Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010) ("Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b-5.") (citing *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ("The scienter element for common law fraud is essentially the same as that under the federal securities laws.") (internal quotations omitted). As Plaintiff has stated a viable Section 10(b) claim against Fischman, Cardis N.V., and Cardis U.S.A. (*see supra*), he has also stated a viable common law fraud claim against these defendants, and as Plaintiff has not stated a viable Section 10(b) claim against Elias and Tokayer (*see supra*), he has also failed to state a viable common law fraud claim against these defendants. Accordingly, Defendants' motion to dismiss Plaintiff's common law fraud claim is granted as to defendants Elias and Tokayer, but otherwise denied.

### 3.    Punitive Damages

Plaintiff included a demand for punitive damages in his Amended Complaint, and Defendants seek a determination that punitive damages are unavailable in this case.   (AC ¶ 85; Def. Br. at 23-24).   While punitive damages are unavailable for federal securities fraud claims, *See Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir. 1998), they may be awarded in connection with common law fraud claims under New York law " 'to punish a defendant for wanton and reckless or malicious acts and to protect society against similar acts.' "   *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 127 (2d Cir. 2013) (quoting *Rivera v. City of New York*, 40 A.D.3d 334, 836 N.Y.S.2d 108, 117 (1st Dep't 2007)).   Punitive damages are available in "limited circumstances" where a defendant has engaged "in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.' "   *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 382 F. Supp. 411, 421 n. 10 (S.D.N.Y. 2003) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315-16, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y. 1995)).

The appropriateness of punitive damages based upon these factors "is a question of fact for the jury."   *Waltree Ltd. v. Ing Furman Selz LLC*, 97 F. Supp.2d 464, 470 (S.D.N.Y. 2000) (citing *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 643 N.Y.S.2d 33, 38 (1st Dep't 1996)).   "A motion to dismiss a claim for punitive damages should be granted only if the plaintiff has 'failed to allege facts sufficient to demonstrate that the [defendants] engaged in conduct which rose to the high level of moral culpability necessary to support a claim for punitive damages.' "   *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 287 (S.D.N.Y. 2014) (quoting *Fin. Servs. Vehicle Trust v. Saad*, 72 A.D.3d 1019, 900 N.Y.S.2d 353, 355 (2d Dep't 2010)).   The Amended Complaint suggests that Fischman and Cardis N.V. / Cardis U.S.A. told Plaintiff and other

28

investors blatant lies regarding Cardis N.V.'s technology and business prospects in order to separate them from their money, and then simply pocketed the investment proceeds rather than applying them toward any revenue-generating activities.   If ultimately proven, a jury could feasibly determine that this falls into the category of "wanton and reckless or malicious acts" warranting punitive damages.   Accordingly, the Court declines to dismiss Plaintiff's demand for punitive damages at this stage of the litigation.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(4), 12(b)(5) and 12(b)(6) is granted only to the extent that: (i) Defendants' Rule 12(b)(5) motion is granted as to defendants Elias and Tokayer; (ii) Defendants' Rule 12(b)(6) motion is granted insofar as Plaintiff's Section 10(b), Section 20(a), and common law fraud claims against defendants Elias and Tokayer are dismissed; and (iii) Defendants' Rule 12(b)(6) motion is granted insofar as Plaintiff's Section 20(a) claims against defendants Cardis N.V., Cardis U.S.A., and Fischman are dismissed.   Defendants' motion is denied in all other respects.

**SO ORDERED.**

*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated: October 27, 2016
        Central Islip, New York

29